Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/11/2025 09:09 AM CDT

State of Nebraska, appellee, v.
James Sawyer, appellant.

___ N.W.3d ___

Filed July 11, 2025.    Nos. S-24-367, S-24-368.

1.  **Trial: Joinder: Appeal and Error.** A trial court's ruling on a motion for consolidation of prosecutions properly joinable will not be disturbed on appeal absent an abuse of discretion.

2.  **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law.

3.  ____: ____. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.

4.  **Trial: Joinder: Appeal and Error.** Whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related so as to be joinable and (2) whether the joinder was prejudicial to the defendant.

5.  ____: ____: ____. To determine whether the charges joined for trial are of the same or similar character, an appellate court looks at the underlying factual allegations.

6.  **Trial: Joinder.** In determining whether offenses are sufficiently connected to be joined, courts consider the temporal and spatial concurrence of the offenses, the concurrence of their investigation and related discovery of evidence, the logical link between the offenses, and the overlap of material witnesses.

7.  **Trial: Joinder: Proof: Appeal and Error.** A defendant opposing joinder of charges must meet a high burden of proving prejudice. To establish prejudice, the defendant must have been deprived of an appreciable chance for an acquittal, a chance that the defendant would have had in a severed trial.

8. **Effectiveness of Counsel: Proof.** Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

9. \_\_\_\_: \_\_\_\_. To show deficient performance under the test described in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

10. **Effectiveness of Counsel: Proof: Appeal and Error.** To show prejudice under the "prejudice" component of the test in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different.

11. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court.

12. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the issue.

13. \_\_\_\_: \_\_\_\_: \_\_\_\_. The record on appeal is sufficient to effectively review the question of ineffective assistance if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.

14. **Property: Warrantless Searches.** Generally, personal property which has been abandoned may be searched without a warrant.

15. **Constitutional Law: Property: Search and Seizure: Police Officers and Sheriffs.** To show abandonment of personal property for purposes of the Fourth Amendment, the State must establish by the greater weight of the evidence that the defendant's voluntary words or conduct would lead a reasonable officer to believe the defendant relinquished his or her property interests in the item.

16. **Property: Search and Seizure.** When determining whether property has been abandoned, courts consider the totality of the circumstances and pay particular attention to the nature and location of any physical relinquishment of the property and any explicit denials of ownership.

17. **Search Warrants: Evidence: Police Officers and Sheriffs.** Absent a showing of pretext or bad faith on the part of the police or the prosecution, valid portions of a warrant are severable from portions failing to meet the particularity requirement.

18. **Search Warrants: Affidavits: Probable Cause.** A search warrant, to be valid, must be supported by an affidavit which establishes probable cause.

19. **Criminal Law: Search and Seizure: Evidence.** The nexus between the alleged crimes and the article to be searched does not need to be based on direct observation; it can be found in the type of crime, the nature of the evidence sought, and the normal inferences as to where such evidence may be found.

20. **Search Warrants.** Even when a search warrant is invalid, the exclusionary rule applies only in those cases in which exclusion will further its remedial purposes.

21. **Search and Seizure: Police Officers and Sheriffs.** To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter such conduct and sufficiently culpable that such deterrence is worth the price paid by the justice system, as exclusion serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

22. **Motions to Suppress: Search Warrants: Affidavits: Police Officers and Sheriffs: Probable Cause.** The good faith exception to the exclusionary rule provides that in the absence of an allegation that the magistrate issuing a warrant abandoned his or her detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.

23. **Hearsay: Words and Phrases.** Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

24. **Evidence.** Cumulative evidence means evidence tending to prove the same point to which other evidence has been offered.

25. **Trial: Convictions: Evidence: Appeal and Error.** Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.

26. **Hearsay.** An out-of-court statement is not hearsay if the proponent offers it for a purpose other than proving the truth of the matter asserted.

27. ____. Statements are not hearsay to the extent they are offered for context and coherence of other admissible statements or to explain the course of a series of events.

28. **Constitutional Law: Hearsay.** A statement that is not hearsay raises no Confrontation Clause concerns, because the Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.

Appeals from the District Court for Douglas County: J Russell Derr, Judge. Affirmed.

Natalie M. Andrews, of Chandler | Conway, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Melissa R. Vincent for appellee.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Cassel, J.

## I. INTRODUCTION

In this direct appeal, James Sawyer challenges the joinder of two informations filed against him for a jury trial and alleges that trial counsel provided ineffective assistance in a multitude of ways. We conclude that the criminal dockets were sufficiently related and that the record shows Sawyer cannot establish he suffered prejudice by the joinder or by counsel's alleged ineffective assistance. Finding no merit to any of Sawyer's challenges, we affirm.

## II. BACKGROUND

The criminal cases leading to this appeal arose out of two drive-by shootings in Omaha, Nebraska, that occurred 3 days apart in February 2019. In each event, Sawyer fired multiple shots from a Draco—an "AK-47-style pistol"—while he was a passenger in a vehicle driven by Adonus Moses.

In the February 5, 2019, incident, Sawyer seriously injured Erica Robinson and killed Elijah Foster. Under docket No. CR19-1318, the State charged Sawyer with seven counts: murder in the first degree; use of a deadly weapon (firearm) to commit a felony (three counts); assault in the first degree;

discharging a firearm at an inhabited house, occupied building, or occupied motor vehicle; and possession of a deadly weapon by a prohibited person.

In the February 8, 2019, incident, Sawyer fired the gun at Aldron Thompson and Thompson's brother but did not hit either person. Under docket No. CR19-1045, the State charged Sawyer with five counts: attempted assault in the first degree (two counts); use of a deadly weapon (firearm) to commit a felony (two counts); and discharging a firearm while in the proximity of any motor vehicle at any person, dwelling, building, structure, or occupied motor vehicle.

The State subsequently moved to consolidate the two cases for trial. Following a hearing, the district court sustained the motion.

A jury trial commenced. First, we recount the circumstances concerning the events of February 5 and 8, 2019. Then, we discuss additional evidence relating to the investigation of the crimes. Finally, we touch on the verdicts and sentencing.

## 1. February 5, 2019, Events

On February 5, 2019, Moses borrowed a friend's Ford Focus automobile and picked up Sawyer, who brought a Draco pistol. Moses was wearing a white sweatshirt. Moses drove to a convenience store. Moses testified that a male in a blue car in the store's parking lot was "jumping around" and "throwing up gang signs," which "bothered [Sawyer]." When the blue car left the parking lot, Moses followed in the Ford Focus.

As Moses drove down Ellison Avenue, Sawyer began shooting the gun out of the passenger-side window. Three bullets struck Robinson as she sat outside smoking at a house near the intersection of Ellison Avenue and North 44th Street. Robinson suffered a significant leg injury, and a tourniquet was applied due to blood loss concerns. Despite serious injuries, Robinson survived.

As Moses continued driving, he thought he heard a gunshot come from a silver car that was in front of him. According to Moses, Sawyer leaned out of the Ford Focus on the passenger

side and began shooting at the car in front of them. Moses testified that the car was hit by bullets on Ellison Avenue, that the car hit a curb and flipped, and that a person fell out of the car's window. That person—Foster—died. An autopsy on Foster revealed two gunshot entrance wounds to the back of his chest. The pathologist opined, to a reasonable medical certainty, that the cause of death was a gunshot wound to the upper part of the trunk.

An Omaha police officer canvassed the area for witnesses and security camera video. He identified Mary Lincoln and Lincoln's aunt as witnesses. An interview of Lincoln approximately 3 hours after the shooting was memorialized with an audio and video recording. At trial, the State offered Lincoln's death certificate and the interview. The court received the evidence, and it was published for the jury without objection. During the interview, Lincoln stated that she heard six or more slow but repetitive gunshots. She saw a dark-complected male wearing a dark hooded sweatshirt, in his early to mid-20s, leaning out the passenger-side window of a car. He had his arm out, holding a black gun that was bigger than a handgun but shorter than a shotgun and looked like an automatic gun. Lincoln stated that the male was shooting toward the houses as the car drove down the street, with no particular target.

Lincoln's aunt testified that she was in her house on "42nd and Ellison" when she heard a noise that "sounded like a flat tire." She looked outside and saw gunfire coming from the passenger side of a black car.

Casings from ammunition that had apparently been fired were located on the north side of Ellison Avenue. If a vehicle were traveling westbound, that location would be near the passenger side of that vehicle. The 19 casings collected were all "TulAmmo 7.62 by 39" casings.

### 2. February 8, 2019, Events

On February 8, 2019, Moses borrowed a blue Chevrolet Impala automobile. He picked up Sawyer, who had a bookbag.

As they were riding in the Impala, they saw two black males get out of a car. Sawyer said, "'Bro, I'm about to eat,'" then scooted over and began shooting out of the driver's-side window. According to Moses, "'about to eat'" means "about to shoot."

As Thompson and his brother walked toward their house located near the intersection of North 39th Street and Kansas Avenue, an Impala in which Thompson observed "a black guy" pulled up behind them. Thompson saw the Impala's window come down, and as he pushed open the door of his house, he heard "a whole bunch of shots." Thompson and his brother crawled on the floor to the backroom of the house.

The Impala that Moses was driving crashed after being struck by a truck. The passenger-side door of the Impala would not open, so Sawyer came across the driver's side and "pressed the gun to [Moses'] gut." Moses grabbed the gun, but then Sawyer took it back and put it in the bookbag. At the time, Moses' hand was cut and Sawyer was wearing gloves. Moses and Sawyer left their cell phones in the Impala. Police subsequently seized the phones, including a gray Motorola phone that was on the passenger seat of the Impala. Moses and Sawyer ran through backyards and "hopped . . . fences." Sawyer did not want to get rid of the gun, so Moses took the bookbag and threw it under a deflated swimming pool.

A detective spoke with a witness who lived in the vicinity of North 39th Street and Kansas Avenue. The witness said that she heard about six gunshots, looked outside, and saw that a blue Impala had crashed in front of her house. She then saw two black males both exit from the driver's side of the Impala, wrapping what she thought was a blue shirt around an item. As the detective tried to follow the general direction of footprints in the snow, he saw a deflated swimming pool under a carport awning, lifted it up, and saw "a black Draco-style handgun wrapped around [sic] a blue item."

Another law enforcement officer had traveled to the area of North 39th Street and Kansas Avenue after receiving "a

ShotSpotter activation of multiple shots being fired in that area." Once he got there, a witness told him that the occupants of a blue Impala were firing shots in the area and that while they did so, the Impala collided with a pickup truck. In the area of North 39th Street and Curtis Avenue, the officer noticed two sets of footprints in the snow that were "traveling" northbound and, based on the spacing, "appeared to be running." Officers located blood on a fence. They continued to follow the footprints and located Moses, who had cuts on his hands and blood on the front of his pants. Other officers apprehended Sawyer about a block and a half away from the first officer and Moses. The sole patterns of the respective shoes worn by Moses and Sawyer were similar to the prints left in the snow.

### 3. Additional Evidence Relating
### to Investigation

#### (a) DNA Evidence

A forensic DNA analyst received a swab from the exterior surfaces of the Draco pistol and detected a mixture of three individuals' DNA. Moses was not excluded as a contributor to the mixture, but there was no evidence that Sawyer's DNA was part of the mixture. The analyst testified that if there was a barrier, such as gloves, between a potential contributor and the surface later swabbed, she would not expect to detect that person's DNA.

#### (b) Ballistic Evidence

A firearm and toolmark examiner with the Omaha Police Department confirmed that the "apparent copper jacket" removed from Foster's back was fired from the Draco. She opined that all 19 casings located in a particular location on February 5, 2019, came from the Draco, as well as six casings located on that same date at a different location. The examiner also testified that casings collected on February 8 at a different location originated from the Draco.

### (c) Ammunition Purchase Evidence

A police officer ascertained that the ammunition for the Draco likely had been purchased from a pawnshop that has two store locations in Omaha, both of which use video surveillance. When a customer wants to sell or pawn an item, the shop records the transaction with a paper receipt that contains the customer's identifying information and that of the item involved. At the shop's 16th Street location, the officer learned that a black male had wanted to exchange certain ammunition he had brought with him for "7.62 by 39-millimeter" ammunition. The shop provided a receipt for the exchange. The receipt and video footage showed Sawyer to be the purchaser of the ammunition.

### (d) Video Compilation Evidence

A quality assurance supervisor with the Omaha Police Department's forensic investigations unit combined surveillance footage from various locations into one exhibit. During trial, officers testified about what the video compilation showed. For example, video footage from February 5, 2019, showed that a window of a Ford Focus was down, with something—possibly a gun—extending out of the window.

### (e) Jail Calls

For context, the record shows that in January 2019, Jacque "Jack" Holbert, a 38th Street Bloods gang member, was killed. Sawyer was upset about having lost a friend and wore a memorial "RIP Jack" button containing Holbert's photograph. Dayton Veland was also a 38th Street Bloods gang member.

Officer Nicholas Yarpe listened to some of Veland's calls because Veland was a friend of Holbert's. Exhibits containing phone calls made on February 5 and 7, 2019, from Veland, who was in jail, to Sawyer were received into evidence. In the February 5 call, Sawyer says, "Jack, on the hood" and also "Drake drake drake thing." With the latter statement, Yarpe explained that Sawyer was talking about the Draco. In the February 7 call, Sawyer says, "Take one of mine, I'm

gonna take one of yours." Yarpe testified that the jail phone
call contained information important to the investigation of
Foster's death:

> There's a part in that phone call where [Sawyer] is talk-
> ing to . . . Veland and telling him, basically, that Jaynes
> Street, which is the opposite neighborhood, they — their
> talk was that the killing of Elijah Foster was over dope.
> [Sawyer] wanted the other neighborhood to know that
> this was not over dope. This was, basically, you take one
> of ours, we're going to take one of yours.

Based on the latter statement, Yarpe "believe[d]" that Sawyer
admitted involvement in the incidents.

### (f) Facebook Records

Officer Brandon Hahn observed a Facebook social media
profile belonging to a person he believed to be Sawyer. He
obtained a warrant for Facebook data for the account. Along
with the Facebook data, Hahn received a certificate of authen-
ticity of domestic records of regularly conducted activity from
Facebook.

During trial, Hahn interpreted the slang—contained in the
Facebook data—exchanged between "Shownolove Sawyer"
(Shownolove) and other users. He interpreted a post on
February 4, 2019, as Shownolove's asking where he could
get some "AK-47 shells." Shownolove claimed to need some
"'ASAP.'" A Facebook friend stated that he had "some '762,'"
which Hahn interpreted to mean 7.62 x 39-mm. Shownolove
asked if he could get it "'Tomorrow.'" About 3 hours prior
to the shootings on February 5, Shownolove asked the friend,
"'Wassup, bro?'"; the friend stated that he "'just got up'"; and
Shownolove responded, "'Yep. Let me know, bro.'"

Hahn interpreted a conversation speaking of the shoot-
ings on February 5, 2019, as Shownolove's "more or less,
say[ing] he did it." Shownolove began the conversation at
approximately 5 p.m. on February 5 by stating, "Omh wee
gonna T-up." Hahn explained that statement meant that he

was "going to go out and do something . . . for [his] people."
Then, at 5:42 p.m.—approximately 10 minutes after the homi-
cide—Shownolove typed, "Did dat" and "On jack." Hahn
explained that Holbert was a victim of a homicide about a
month prior to the February 2019 shootings and that Sawyer
had been seen wearing an "RIP Jack" button. According to
Hahn, "'[o]n Jack'" meant "on the pride of Jack or the mem-
ory of." After "Lilshoota SoOcho" (Lilshoota) typed that he
hoped "somebody got hit," there was a Facebook phone call
between Shownolove and Lilshoota. Subsequently, Lilshoota
sent Shownolove a link to a news article, the summary of
which stated, "Police have confirmed one person is dead at the
scene of a shooting near N. 47th and Ellison."

A few hours after the February 5, 2019, shootings,
Shownolove sent a message trying to trade a Draco for "two
hand things," which Hahn interpreted to mean handguns.
Shownolove then sent an image of the Draco.

### (g) Cell Phone Data

Law enforcement seized three cell phones from the Impala
and obtained a warrant to search them and to extract their data.
Oscar Dieguez conducted an extraction on a black and gray
Motorola cell phone found in the Impala. The phone number
assigned to that phone was the same phone number contained
in the Facebook subscriber information for Shownolove. The
phone's "autofill database" contained values for the same
phone number, for "James Lee Sawyer," and for the email
address sawyer38lb@gmail.com.

Dieguez began looking through conversations to see what
might "tie back" to the phone's owner. He found a conver-
sation between "Face-book.tech" and the phone's user in
which the user stated, "'This is James.'" When asked for the
user's Facebook password, the user provided "'Sawyer38'"
and "'sawyerboy.'" Dieguez looked at the user accounts on
the phone, and in addition to the above email address, there
was a Facebook account with the name "Shownolove Sawyer."

The phone's "snapshot folder" contained a "JPEG" file showing Sawyer holding a Draco.

### 4. Verdicts and Sentencing

The jury returned a guilty verdict on all charges in each case, and the court entered judgment on the verdicts. The court subsequently sentenced Sawyer to life imprisonment for the murder conviction and imposed consecutive sentences of imprisonment for the other convictions.

Through counsel different from trial counsel, Sawyer appealed. The appeal was docketed directly in this court.[1]

## III. ASSIGNMENTS OF ERROR

Sawyer assigns seven errors. One asserts that the court erred when it consolidated the criminal dockets. Six assign that he received ineffective assistance of trial counsel. These assignments, restated, specify that trial counsel failed to (1) move to suppress cell phone contents and records, (2) move to suppress Facebook records, (3) object to Lincoln's statements on Confrontation Clause or hearsay grounds, (4) object to jail phone calls on Confrontation Clause or hearsay grounds, (5) object to law enforcement officers' interpretations of surveillance video identifying Sawyer, and (6) move for a determination regarding Sawyer's competency after the verdicts and before sentencing.

## IV. STANDARD OF REVIEW

[1] A trial court's ruling on a motion for consolidation of prosecutions properly joinable will not be disturbed on appeal absent an abuse of discretion.[2]

[2,3] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law.[3] In reviewing claims of ineffective assistance of counsel

---

[1]  See Neb. Rev. Stat. § 24-1106(1) (Cum. Supp. 2024).

[2]  *State v. Wofford*, 298 Neb. 412, 904 N.W.2d 649 (2017).

[3]  *State v. Swartz*, 318 Neb. 553, 17 N.W.3d 174 (2025).

on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.[4]

## V. ANALYSIS

### 1. Joinder

#### (a) Propositions of Law

There is no constitutional right to a separate trial.[5] Rather, joinder and severance are controlled by a long-established statute.[6]

Section 29-2002 first addresses joinder of offenses and separate trials. As relevant to the circumstances here, § 29-2002(2) authorizes a court to "order two or more . . . informations . . . to be tried together if the offenses could have been joined in a single . . . information." Section 29-2002(1) instructs that offenses can be joined in a single information "if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

Another subsection imposes a limitation on joinder: "If it appears that a defendant or the state would be prejudiced by a . . . joinder of offenses in separate . . . informations . . . for trial together, the court may order an election for separate trials of counts [or] informations . . . , grant a severance of defendants, or provide whatever other relief justice requires."[7]

[4] As this language demonstrates, whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related so as to be joinable and (2)

---

[4] *Id.*

[5] *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023).

[6] Neb. Rev. Stat. § 29-2002 (Reissue 2016).

[7] § 29-2002(3).

whether the joinder was prejudicial to the defendant.[8] Joinder of related offenses is intended to promote the goals of trial convenience and judicial economy.[9]

### (i) Sufficiently Related

[5,6] To determine whether the charges joined for trial are of the same or similar character, an appellate court looks at the underlying factual allegations.[10] Charges, to be similar, need not arise at the same time or out of the same series of acts or transactions.[11] In determining whether offenses are sufficiently "connected" to be joined, courts consider "the temporal and spatial concurrence of the offenses, the concurrence of their investigation and related discovery of evidence, the logical link between the offenses, and the overlap of material witnesses."[12]

### (ii) Prejudice

[7] A defendant opposing joinder of charges must meet a high burden of proving prejudice.[13] To establish prejudice, the defendant must have been deprived of an appreciable chance for an acquittal, a chance that the defendant would have had in a severed trial.[14]

### (b) Discussion and Resolution

Sawyer highlights that the charges involved different acts, different outcomes, different victims, and different eyewitnesses. He thus argues that the actions and events under the two criminal dockets were not the same or similar in character.

---

[8] *State v. Garcia, supra* note 5.

[9] See *State v. Corral*, 318 Neb. 940, 20 N.W.3d 372 (2025).

[10] *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014).

[11] See *State v. Corral, supra* note 9.

[12] See *id.*, 318 Neb. at 966, 20 N.W.3d at 397.

[13] *State v. Corral, supra* note 9.

[14] See *id.*

We disagree. We start with the charges in each criminal docket.

Under docket No. CR19-1318, the State charged Sawyer with murder in the first degree; use of a deadly weapon (firearm) to commit a felony (three counts); assault in the first degree; discharging a firearm at an inhabited house, occupied building, or occupied motor vehicle; and possession of a deadly weapon by a prohibited person. The charges arose out of Sawyer's shooting a Draco on February 5, 2019, in Douglas County, Nebraska, and striking two people with bullets, which resulted in the death of one person and serious injuries to the other.

Under docket No. CR19-1045, the State charged Sawyer with attempted assault in the first degree (two counts), use of a deadly weapon (firearm) to commit a felony (two counts), and discharging a firearm while in the proximity of any motor vehicle at any person, dwelling, building, structure, or occupied motor vehicle. Those charges arose out of Sawyer's shooting a Draco on February 8, 2019, in Douglas County, with the bullets missing two individuals.

A simple comparison of the respective informations shows a basic similarity. They allege that Sawyer used a firearm in shootings that, by comparison of the charged dates and locations, occurred 3 days apart in the same Nebraska county.

The underlying factual allegations are more compelling. In both cases, as a passenger in a vehicle driven by Moses, Sawyer fired a Draco at the various victims. The shootings took place in the same general area of Omaha. Further, there was evidence that Sawyer committed both shootings as "parts of a common scheme or plan," as contemplated in § 29-2002(1), to avenge Holbert's murder. We conclude the dockets were properly joined for trial.

Our conclusion is supported by *State v. Knutson*.[15] There, the defendant was charged with crimes against four victims.

---

[15] *State v. Knutson, supra* note 10.

We determined that the charges of child abuse and child enticement through an electronic device of one victim, of third degree sexual assault of a child of two other victims, and of child abuse of a fourth victim were "of the same or similar character" and joinable under § 29-2002(1). We observed that there were significant similarities between the facts underlying the charges, because each of the victims attended the same middle school at some point, they were similar in age when the alleged misconduct occurred, the allegations all involved illegal sexual conduct, and the defendant occupied positions of trust (teacher, tutor, coach) with each of the victims, which positions he allegedly abused.

Having concluded that joinder was proper, we also must consider whether the otherwise proper joinder caused Sawyer prejudice. It did not.

The joinder here did not deprive Sawyer of an appreciable chance of acquittal in either case. Evidence overwhelmingly supported Sawyer's guilt of the charges arising from the February 5, 2019, shooting. Not only did Moses identify Sawyer as the shooter, but Sawyer essentially admitted to Veland that he shot Foster. Further, surveillance video showed Sawyer purchasing ammunition and Sawyer photographed himself holding a Draco. With regard to the February 8 crimes, Sawyer admitted to the shooting during his postarrest interview, although he said he was shooting at the house and not "the kids." Thus, even if Sawyer's cases had been tried separately, in neither case did he have a considerable chance of acquittal.

## 2. Ineffective Assistance of Counsel

### (a) Propositions of Law

[8-10] Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[16] the

---

[16] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[17] To show deficient performance under the *Strickland* test, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[18] To show prejudice under the "prejudice" component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different.[19]

[11] An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court.[20]

[12] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved.[21] The determining factor is whether the record is sufficient to adequately review the issue.[22] In other words, the record must be sufficient to address the claim without an evidentiary hearing.[23]

[13] The record on appeal is sufficient to effectively review the question of ineffective assistance if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial

---

[17] *State v. Corral, supra* note 9.

[18] *Id.*

[19] *Id.*

[20] *State v. Swartz, supra* note 3.

[21] *State v. Corral, supra* note 9.

[22] *Id.*

[23] *Id.*

counsel's actions could not be justified as a part of any plausible trial strategy.[24]

### (b) Discussion Regarding Claims of Ineffectiveness

With the above principles in mind, we consider each allegation of ineffectiveness raised by Sawyer in this direct appeal.

#### (i) Failure to Move to Suppress Cell Phone Evidence

Sawyer argues counsel should have sought to suppress the evidence obtained from the searches of his cell phone and his cell phone records. He contends that the search warrant failed to "provide the requisite evidentiary nexus between the place to be searched, the cellular phone, and specific facts amounting to probable cause to support why evidence of the crimes will be contained within."[25]

[14,15] The State contends that Sawyer's claim of ineffectiveness premised upon the search warrant for the cell phone fails because Sawyer abandoned the phone. Generally, personal property which has been abandoned may be searched without a warrant.[26] It is well settled that once a defendant abandons an item of personal property and makes it available to the police or the public, he or she does not retain a reasonable expectation of privacy in the property for purposes of Fourth Amendment protection.[27] To show abandonment of personal property for purposes of the Fourth Amendment, the State must establish by the greater weight of the evidence that the defendant's voluntary words or conduct would lead a reasonable officer to believe the defendant relinquished his or her property interests in the item.[28] We observe that in a

---

[24] *Id.*

[25] Brief for appellant at 30.

[26] See *State v. Dixon*, 306 Neb. 853, 947 N.W.2d 563 (2020).

[27] *Id.*

[28] See *id.*

case where a defendant left behind a cell phone in a crashed vehicle and initially denied any knowledge of the wrecked vehicle, the Eighth Circuit concluded that the trial court did not clearly err in finding abandonment and denying the defendant's motion to suppress.[29]

[16] During oral arguments, Sawyer's counsel urged us to find the record insufficient to resolve the issue of abandonment. When determining whether property has been abandoned, courts consider the totality of the circumstances and pay particular attention to the nature and location of any physical relinquishment of the property and any explicit denials of ownership.[30]

We examine the circumstances, which clearly establish abandonment. The record shows that Moses and Sawyer both fled on foot from the wrecked Impala. In doing so, they abandoned the Impala and its contents—including three cell phones. When found, one of the phones—a Motorola—had a charging cord attached and was "plugged in." Upon questioning by law enforcement, Sawyer denied ownership of the Motorola cell phone found in the Impala. Sawyer told police that his phone was a Samsung and that it was in his coat at a friend's house.

Because Sawyer abandoned the cell phone, he forfeited any expectation of privacy in that item and could not raise a Fourth Amendment challenge to the subsequent search. Thus, counsel could not have performed deficiently by failing to seek suppression.

Sawyer also claims that counsel provided ineffective assistance by failing to move to suppress his cell phone records. He points out that the warrant requested "'call detail records and cellular tower data.'"[31]

---

[29] *U.S. v. Crumble*, 878 F.3d 656 (8th Cir. 2018).

[30] *State v. Dixon, supra* note 26.

[31] Brief for appellant at 31.

However, the State did not offer any evidence from Sawyer's cell phone records at trial. Although Dieguez testified about information similar to that requested from the cell service provider, Dieguez learned of that information from the extraction of the entire contents of the Motorola—not from the records of Sawyer's cell service provider. In *State v. Henderson*,[32] we found that the defendant could not show prejudice from counsel's failure to challenge a search to obtain a phone number from a cell phone where no evidence at trial used the cell phone's phone number to demonstrate that the phone belonged to the defendant. Similarly, here, cell phone records covering matters such as subscriber information and cellular tower location data were not used or offered into evidence at trial.

Thus, the record shows that Sawyer cannot establish prejudice by counsel's failure to seek suppression of such records.

### (ii) Failure to Move to Suppress Facebook Evidence

Sawyer claims counsel should have moved to suppress his Facebook records because the search warrant was "horribly deficient" in several respects.[33] We address the alleged deficiencies and find that the record shows Sawyer cannot establish prejudice.

First, Sawyer claims that the warrant lacked particularity because it requested records for 13 different accounts. But only two of those accounts appear to belong to Sawyer, and he would lack standing to challenge a warrant authorizing a search of items in which he did not have a protected Fourth Amendment interest.[34] Further, the State offered evidence from Sawyer's Facebook account only. Sawyer does not dispute that probable cause existed to search his records.

[17] Second, Sawyer challenges the temporal range of the warrant. It sought records from January 1 to February 13,

---

[32] *State v. Henderson*, 301 Neb. 633, 920 N.W.2d 246 (2018).

[33] Brief for appellant at 35.

[34] See *State v. Nelson*, 282 Neb. 767, 807 N.W.2d 769 (2011).

2019. Assuming without deciding that the temporal range was too broad, we have stated that absent a showing of pretext or bad faith on the part of the police or the prosecution, valid portions of a warrant are severable from portions failing to meet the particularity requirement.[35] Here, the record does not suggest that law enforcement acted in bad faith or with pretext. Moreover, the Facebook postings discussed at trial—made between February 4 and 6—were related to the shootings on February 5 and 8. Accordingly, those messages would not be subject to suppression.

[18,19] Third, Sawyer claims that the search warrant lacked an evidentiary nexus between the investigation and Sawyer's Facebook records. A search warrant, to be valid, must be supported by an affidavit which establishes probable cause.[36] The nexus between the alleged crimes and the article to be searched does not need to be based on direct observation; it can be found in the type of crime, the nature of the evidence sought, and the normal inferences as to where such evidence may be found.[37]

Here, the affidavit for the search warrant set out facts resulting from the investigation into the shootings on February 5 and 8, 2019, with sufficient particularity. It stated that on February 8, officers were summoned to an area due to shots fired, that Moses and Sawyer were found to have attempted to hide a Draco, that the Draco was the weapon in Foster's homicide, that Sawyer was found to have two Facebook accounts and Moses one such account, and that data from social media can "potentially provide a wealth of information that can assist in determining the motivation, method and/or participants involved in a criminal investigation." The affidavit stated that communication records can help establish an individual's

---

[35] *State v. Jennings*, 305 Neb. 809, 942 N.W.2d 753 (2020). See, also, *State v. LeBron*, 217 Neb. 452, 349 N.W.2d 918 (1984).

[36] *State v. Hill*, 288 Neb. 767, 851 N.W.2d 670 (2014).

[37] *State v. Short*, 310 Neb. 81, 964 N.W.2d 272 (2021).

culpability and knowledge of an investigated incident. Overall, the information in the affidavit contained sufficient particularized information to support probable cause.

[20-22] And even if it did not, the record shows that Sawyer still would be unable to show prejudice. Even when a search warrant is invalid, the exclusionary rule applies only in those cases in which exclusion will further its remedial purposes.[38] To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter such conduct and sufficiently culpable that such deterrence is worth the price paid by the justice system, as exclusion serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.[39] The good faith exception to the exclusionary rule provides that in the absence of an allegation that the magistrate issuing a warrant abandoned his or her detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.[40] The affidavit here contained evidence about the criminal activity and the places to be searched, such that law enforcement officers acted in objectively reasonable good faith in relying upon the warrant when executing the search.

### (iii) Failure to Object to Lincoln's Statement

[23] Sawyer argues that his counsel should have objected to Lincoln's statement regarding the shootings on February 5, 2019, claiming that it was inadmissible hearsay and that it violated his right to confrontation. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the

---

[38] *State v. Hill, supra* note 36.

[39] *State v. Short, supra* note 37.

[40] *State v. Hill, supra* note 36.

matter asserted.[41] Because Lincoln died prior to trial, she was unavailable to testify, and the State therefore offered into evidence her recorded interview by law enforcement.

[24,25] The information contained in Lincoln's statement was cumulative to other admitted evidence. Cumulative evidence means evidence tending to prove the same point to which other evidence has been offered.[42] Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.[43] Lincoln informed law enforcement that a male in a dark hooded sweatshirt fired a gun out the passenger-side window of the Ford Focus. Moses provided similar testimony. Further, photographs received into evidence that were taken from a compilation of surveillance videos showed the driver of the Ford Focus wearing a white hooded sweatshirt and the passenger wearing dark clothing. Lincoln's aunt testified that shots were fired from the passenger side of the vehicle. Ejected casings consistent with ammunition fired from the Draco were located on the side of the street that would be on the passenger side of a westbound vehicle. Because Lincoln's statement was cumulative to other evidence, the record shows that Sawyer cannot demonstrate prejudice based on counsel's failure to object.

### (iv) Failure to Object to Jail Phone Calls

Sawyer asserts that counsel provided ineffective assistance by failing to object to the jail phone calls between Sawyer and Veland. According to Sawyer, Veland's statements were inadmissible hearsay and violated his right to confrontation. We disagree.

[26,27] An out-of-court statement is not hearsay if the proponent offers it for a purpose other than proving the truth of

---

[41] *State v. Mabior*, 314 Neb. 932, 994 N.W.2d 65 (2023), *cert. denied* ___ U.S. ___, 144 S. Ct. 1073, 218 L. Ed. 2d 249 (2024).

[42] *State v. Corral, supra* note 9.

[43] *Id.*

the matter asserted.[44] Thus, statements are not hearsay to the extent they are offered for context and coherence of other admissible statements or to explain the course of a series of events.[45]

[28] Here, Veland's statements were not offered for their truth, but, rather, to provide context for Sawyer's statements made within the phone call. And as we recently stated, "'A statement that is not hearsay raises no Confrontation Clause concerns,' [because] the Confrontation Clause does not 'bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'"[46] Because an objection based on hearsay and Confrontation Clause grounds would have been futile, counsel did not perform deficiently by failing to object.

### (v) Failure to Object to Officers' Interpretation of Video

Sawyer claims trial counsel was ineffective for failing to object to law enforcement officers' interpretation of surveillance video identifying Sawyer. This claim is aimed at surveillance video from the pawnshop, along with footage from the convenience store, about which law enforcement officers were able to provide testimony.

The officers' testimony was cumulative to other evidence. Moses testified that Sawyer was the shooter. Moses also identified Sawyer based on still photographs taken from the video. Further, Sawyer's name was printed on the pawnshop's receipt for the purchase of "Tul Ammo Ammunition 7.62 x 39 mm." And Sawyer basically admitted to being the shooter in Facebook exchanges and in his phone call with Veland. Because this evidence was cumulative to other

---

[44] *State v. Vaughn*, 314 Neb. 167, 989 N.W.2d 378 (2023), *cert. denied* ___ U.S. ___, 144 S. Ct. 241, 217 L. Ed. 2d 109.

[45] *State v. Corral, supra* note 9.

[46] *State v. Vaughn, supra* note 44, 314 Neb. at 190, 989 N.W.2d at 397.

properly admitted evidence, the record shows that Sawyer cannot establish prejudice based on counsel's failure to object.

*(vi) Failure to Obtain Competency Evaluation*

Finally, Sawyer claims that counsel should have obtained an additional competency evaluation prior to sentencing. The record shows that competency was an issue earlier in the case. In 2021, the court found that Sawyer was not competent to stand trial and committed him to the Lincoln Regional Center for treatment. Eventually, in October 2023, the court found Sawyer competent to stand trial.

But Sawyer assigns no error to the sentences imposed and, with regard to the assertion of ineffective assistance of counsel, fails to assign failure of trial counsel to communicate with Sawyer or to identify suspect behavior after the verdicts and before sentencing. Sawyer's brief states that "competency is fleeting, and the issue resurfaced at the time of sentencing."[47] But at sentencing, counsel merely recounted that "on two separate occasions, [Sawyer] was committed to the Lincoln Regional Center for further evaluation, that there were indications that he had psychotic episodes and that he was having a difficult time in the here and now, specifically auditory hallucinations." There, trial counsel was referring to events before trial. Trial counsel did not assert that Sawyer had experienced any such episodes after trial.

We conclude that the record establishes that Sawyer cannot establish prejudice regarding lack of competency prior to the verdicts. Nor does the record show anything during the interval before sentencing that should have alerted a lawyer with ordinary training and skill in criminal law that a competency evaluation should be requested. In the absence of any allegation that Sawyer became incompetent after trial but before his sentencing hearing, he has failed to plead deficient performance by counsel.

---

[47] Brief for appellant at 65.

## VI. CONCLUSION

For the reasons provided above, we conclude the following:

• The two criminal informations filed against Sawyer were sufficiently related to be joined for trial, and the joinder did not deprive Sawyer of an appreciable chance of acquittal in either case.

• Sawyer's numerous claims of ineffective assistance of counsel raised on direct appeal fail, because the record shows either that counsel did not perform deficiently, that Sawyer cannot establish prejudice, or that Sawyer failed to sufficiently plead deficient performance.

We therefore affirm the convictions and sentences.

Affirmed.