IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. GASPAR-ANTONIO

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

ESTEBAN GASPAR-ANTONIO, APPELLANT.

Filed November 25, 2025.    No. A-25-040.

Appeal from the District Court for Douglas County: HORACIO J. WHEELOCK, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Leslie E. Cavanaugh for appellant.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellee.

PIRTLE, WELCH, and FREEMAN, Judges.

WELCH, Judge.

## I. INTRODUCTION

Following a jury trial, Esteban Gaspar-Antonio was convicted of one count of first degree sexual assault of a child and three counts of third degree sexual assault of a child. He assigns as error on appeal that the evidence was insufficient to support his convictions, the sentences imposed were excessive, and his trial counsel was ineffective. For the reasons stated herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Maria Z. is the biological mother of S.R.-L., who was born in January 2007, and D.G.-L., who was born in May 2009 (referred to collectively as "the victims"). Gaspar-Antonio is S.R.-L's stepfather and is D.G.-L's biological father. The family lived together in various apartments and homes and both Maria and Gaspar-Antonio worked to support the family while working

- 1 -

inconsistent days and hours. According to D.G.-L., Gaspar-Antonio started touching her inappropriately when she was approximately 9 years old and the touching took place twice per week until she was 12 or 13 years old. S.R.-L. also reported that Gaspar-Antonio had touched her inappropriately. The abuse stopped in March 2022 after Gaspar-Antonio left Nebraska to work in Washington State and did not have physical access to the victims.

The victims eventually disclosed to Maria that Gaspar-Antonio was touching them in a way that made them uncomfortable. D.G.-L. stated that Maria did not care, she did not believe them, and she would choose Gaspar-Antonio over them. S.R.-L similarly stated that Maria did not believe them and stated that she would ask Gaspar-Antonio. Following Maria's reaction to the victims' disclosures, the victims discussed disclosing the sexual abuse to school authorities. Around this same time, after S.R.-L's 15th birthday, Gaspar-Antonio told S.R.-L during a telephone call that "now that you are 15, when I come back from Washington, I'm going to do something to you," which she interpreted to mean that Gaspar-Antonio was going to try to have sex with her. In response, S.R.-L. decided to disclose the prior abuse to Sabrina Young, her former elementary school teacher, whom she contacted by text and phone call. Separately, D.G.-L. disclosed to a counselor that Gaspar-Antonio was sexually abusing her. Both the counselor and Young reported the abuse to the child abuse and neglect hotline in October 2022.

The October 2022 intake report was transmitted to Breanna Rockwell, a Department of Health and Human Services (DHHS) initial assessment worker. As part of her investigation, Rockwell visited S.R.-L. at school and, after S.R.-L. disclosed concerning information, Rockwell immediately contacted the child victim sexual assault unit. Detective Juan Jimenez received the CPS report and immediately referred the victims for forensic interviews, which were scheduled for the following day. Detective Jimenez dispatched parole officers to transport the victims from school to Project Harmony for their forensic interviews because Maria "was not being appropriate because she was made aware about the allegations."

During their forensic interviews, both S.R.-L. and D.G.-L. disclosed sexual abuse by Gaspar-Antonio. Following their forensic interviews, both D.G.-L. and S.R.-L. underwent medical exams. During D.G.-L's medical exam, she told the examiner that, more than once, Gaspar-Antonio "touched me where I didn't want to be touched" including D.G.-L's "private," "boobs," and "butt," with his hands both on top of her clothes and under her clothes, and that the last time Gaspar-Antonio touched her was when she was 12 years old.

During S.R.-L's medical examination, she disclosed to the examiner that Gaspar-Antonio "sexually touched me" on "my vagina, and my boobs," with his hands over and underneath her clothes and that he had slapped her on the butt over her clothes. S.R.-L. further disclosed that Gaspar-Antonio touched both the outside and inside of her vagina, which caused her pain, but she denied any bleeding. According to S.R.-L., the touching occurred on more than one occasion.

Following the forensic interviews and after consulting with Detective Jimenez, Rockwell decided that the victims and their siblings were at risk of harm in the care and custody of their parents and placed them in foster care, where they have remained since that time.

On October 24, 2022, Gaspar-Antonio was arrested when he returned to Nebraska. He was charged with one count of first degree sexual assault of a child related to S.R.-L; one count of third degree sexual assault related to S.R.-L.; and two counts of third degree sexual assault of a child related to D.G.-L.

## 2. TRIAL

The trial was held in October 2024. Although there are issues raised on appeal regarding jury selection, the evidence related to that assignment of error will be addressed in the argument section of this opinion. Due to Gaspar-Antonio's limited understanding of the English language, interpreters were present throughout the trial and sentencing. Evidence was received as previously set forth and additional testimony was adduced from Detective Jimenez; Sabrina Young, S.R.-L's former elementary school teacher; the victims; Maria; and Gaspar-Antonio. The evidence at trial established that Gaspar-Antonio was born in May 1981; D.G.-L was born in May 2009; and S.R.-L was born in January 2007.

### (a) Detective Juan Jimenez' Testimony

Detective Jimenez testified that, after he observed the victims' October 2022 forensic interviews, he interviewed Maria. As a result of that interview, he became concerned about the victims' safety in Maria's home because the victims "both disclosed that they had talked to [Maria] and that they had both disclosed that [Maria] was not believing of them. And she made statements saying that she was wasn't going to choose them over him." Detective Jimenez testified that when he confronted Maria, "she said that pretty much it was true, that [Gaspar-Antonio] is the one . . . that works and the one that pays the bills and the rent and that she wasn't going to choose the kids over him." Detective Jimenez testified that initially, Maria denied knowing about the allegations, but eventually admitted that the victims disclosed the allegations to her approximately 3 weeks prior to the CPS report but that she did not believe the allegations or take them seriously. Detective Jimenez stated that because of those safety concerns, the children were removed from Maria's home and placed in DHHS custody.

### (b) Sabrina Young's Testimony

Young testified that she was S.R.-L.'s elementary school teacher in approximately 2015, but she had very little contact with S.R.-L. after S.R.-L. entered middle school. This changed on October 18, 2022, when S.R.-L. sent Young a message stating, "I don't know what to do but my stepdad been sexually touching me but [he is] not here in Omaha, but I don't want him to come back and keep doing it to me and I can't really explain over text I don't know what to do." S.R.-L. also stated that she did not want Maria to "know anything about this." Young testified that she responded to S.R.-L. stating

> Honey thank you so much for trusting me to tell me about this. You are so brave and I am so proud of you!!! My job is to make sure you are safe, so I did have to call and make a report of what you told me he is doing to you. I am here for you always and forever. If you want to talk to me, please talk to me. You know I love you and care about you so much. I'll do anything I can to support you and help you.

Young testified that she had a 20 to 30 minute phone call with S.R.-L., and during that phone call, S.R.-L. disclosed specific details about the sexual abuse, which Young immediately reported to the child abuse and neglect hotline. The text messages between Young and S.R.-L. were admitted into evidence without objection. Young testified that she has not had any further contact with S.R.-L since the summer of 2023.

## (c) D.G.-L.'s Testimony

D.G.-L., who was 15 years old at the time of trial, testified that Gaspar-Antonio started touching her when she was around 9 years old when the family lived in an apartment and continued after they moved into the "green house." According to D.G.-L., the touching occurred twice a week from the time she was 9 years old until she was 12 or 13 years old and occurred after school when Maria was at work. D.G.-L. testified that, more than once, Gaspar-Antonio touched her vagina, boobs, and butt with his hands both over and under her clothing and that Gaspar-Antonio threatened to hit her if she told Maria. On another occasion, Gaspar-Antonio told D.G.-L. to come lie next to him in his bedroom after which "he started putting his hands inside my underwear and . . . touching my private part" and that Gaspar-Antonio moved his hands around on her vagina and afterward told her not to tell anyone. D.G.-L. testified to other instances when Gaspar-Antonio came into her bedroom, laid on top of her and started touching her breasts underneath her shirt, and another instance when she was washing the dishes and Gaspar-Antonio hugged her from behind and slapped her butt.

D.G.-L. admitted that she did not get along with Gaspar-Antonio and did not refer to him as her dad because he worked all the time, he was never around, he yelled a lot, and he hit her. D.G.-L. acknowledged that although Gaspar-Antonio worked two jobs, one during the day and the other during the night, his schedule changed, and sometimes he would work during the day and other times he would work at night.

## (d) S.R.-L.'s Testimony

S.R.-L., who was 17 years old at the time of trial, testified that Maria worked from 5 a.m. to 4 p.m. during the week and sometimes worked on weekends. S.R.-L. testified that Gaspar-Antonio worked in construction and at a meat packaging place, but that he had a lot of days off, his hours were different, and that sometimes he would go to work during the day and other times he would go to work at night.

S.R.-L testified that on more than one occasion, Gaspar-Antonio touched her in a way that made her uncomfortable. S.R.-L. testified that when she was in middle school, around 13 years old, Gaspar-Antonio touched her breasts and her vagina with his hands. S.R.-L. testified to a specific occasion when Gaspar-Antonio called her into his room telling her they needed to talk and

> I remember that he just started grabbing me on my belly with his hands. And he pushed me down on the bed, and I was laying, and he was sitting right next to me. And I remember him opening his hands in my pants, and he was touching me on my vagina on top of my underwear.

S.R.-L. testified that, during this incident, her younger sister was in the room sleeping in her crib, so S.R.-L banged on the cabinet next to the bed in an attempt to wake her up so Gaspar-Antonio would stop.

S.R.-L. testified that, on another occasion, Gaspar-Antonio entered her bedroom while she was lying on her bed. He sat next to her "[a]nd he had all of a sudden, like, just grabbed me in force, and he had went under the blanket, his hands had went under the blanket. And I remember him going under my underwear, and he just started touching" her in circular motions with his fingers on her vagina. Another time, S.R.-L. described that Gaspar-Antonio touched his lips to her

vagina, then "put his fingers in." S.R.-L. described that it was "hurting" and when she ran to the restroom, she noticed that she "was bleeding when I had wiped."

S.R.-L. testified that Gaspar-Antonio put his fingers inside her vagina once, but that he touched the outside of her vagina both under and over her clothes on more than one occasion. S.R-L. testified that Gaspar-Antonio told her not to tell her mom and threatened to kick her out of the house and told her that, if Gaspar-Antonio went to jail, the family would have no home and no money because "without him, we were nothing." S.R.-L. testified that the touching stopped when she was in 8th grade when Gaspar-Antonio left to work in Washington.

S.R.-L. testified that at some point after her 15th birthday, Gaspar-Antonio told her over the phone that "now that you are 15, when I come back from Washington, I'm going to do something to you." S.R.-L. testified that she took this to mean that Gaspar-Antonio was going to try to have sex with her. S.R.-L. also acknowledged that between her forensic interview, the medical exam, the deposition, and her trial testimony, some of her answers were inconsistent such as the date and details about the first time Gaspar-Antonio touched her and whether she previously had told the nurse that she did not have any bleeding.

S.R.-L. admitted that her relationship with Gaspar-Antonio was never good and that they argued "over chores, but, basically, he would make me fold his clothes, cook for him. And at that time, he was . . . touching me, and I just didn't think it was right for me to be doing stuff for him when he was disrespecting me."

### (e) Maria's Testimony

As a witness for the defense, Maria testified that she met Gaspar-Antonio in 2008, and they had their first child together in 2009. Maria testified that Gaspar-Antonio was living with them when the victims' younger sister was born in 2014. She testified that between 2017 and 2021, Gaspar-Antonio worked two jobs, was never home before 5 p.m., and that she was always home when he got back from work. Additionally, Maria testified that Gaspar-Antonio would go straight from one job to the other and that he was never alone with the children. She testified that maybe twice a week, Gaspar-Antonio would come home early from work around 5 p.m., but that most other days, he did not return until 11 p.m.

Maria acknowledged that there were times when Gaspar-Antonio was home alone with the victims, including for approximately 15 minutes in the mornings, when he was recovering from a surgical operation, and for "a couple of weeks" when he was out of work.

### (f) Gaspar-Antonio's Testimony

Gaspar-Antonio testified that he had never been alone with either S.R.-L. or D.G.-L. and denied touching either victim. He testified that between 2017 and 2021, he worked from 6 a.m. to 4 p.m. at his first job and then went straight to his second job from 5 p.m. to 11 p.m. Gaspar-Antonio testified that he was out of work for 3 weeks in 2020 after having surgery, but that family members from Washington came to stay with him. However, Gaspar-Antonio acknowledged that at the end of 2021, he left his second job and worked only during the night shift from 5 p.m. to 11 p.m. or 12 a.m. until he left for Washington in early 2022.

### 3. Verdict and Sentence

In November 2024, the jury returned a guilty verdict on all charges. Thereafter, the district court sentenced Gaspar-Antonio to 25 to 35 years' imprisonment for first degree sexual assault of a child and 2 to 3 years' imprisonment on each of the three third degree sexual assault of a child convictions. The sentences were ordered to run concurrently, and Gaspar-Antonio was given 786 days for time served. Gaspar-Antonio now appeals from his convictions and sentences, represented by new counsel on appeal.

## III. ASSIGNMENTS OF ERROR

Gaspar-Antonio assigns, renumbered, that (1) the evidence was insufficient to support his convictions, (2) the district court imposed an excessive sentence, and (3) his trial counsel was ineffective in failing to: (a) file any pretrial motions or object to prevent the admission of testimony related to the victims and their siblings being placed in foster care, (b) file any pretrial motions or object to Detective Juan Jimenez' testimony that it was unsafe for the children to remain in their home, (c) file any pretrial motions or object to Maria's reaction to the victims' disclosure, (d) file any pretrial motions or object to the text messages between Young and S.R.-L., (e) object to the introduction of evidence relating to the victims' states of mind, (f) object to the leading redirect of both alleged victims and request a recross-examination to impeach the victims on new evidence admitted during redirect, (g) challenge two jurors for cause, (h) introduce alibi evidence consisting of testimony from his sister-in-law and work records, and (i) that the cumulative effect of counsel's errors and failures amounted to a deprivation of a fair trial by an impartial jury.

## IV. STANDARD OF REVIEW

In reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Vazquez,* 319 Neb. 192, 21 N.W.3d 615 (2025).

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Barnes,* 317 Neb. 517, 10 N.W.3d 716 (2024).

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *Id.*

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Vazquez, supra*. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.* The record on appeal is sufficient if it establishes either that trial

counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id.* Conversely, an ineffective assistance of counsel claim will not be addressed on direct appeal if the record is insufficient to address it. *Id.*

Whether cumulative error deprived a criminal defendant of his or her Sixth Amendment right to a trial by an impartial jury presents a question of law to be reviewed de novo. *State v. Anders,* 311 Neb. 958, 977 N.W.2d 234 (2022).

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

Gaspar-Antonio first assigns as error that the evidence was insufficient to support his convictions because the State failed to prove penetration and/or sexual contact on the dates alleged in the amended information. He also contends that the absence of physical evidence, in combination with the inconsistencies in the victims' testimonies, did not support the guilty verdicts.

Before addressing Gaspar-Antonio's claims, we restate our standard of review: In reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Vazquez*, 319 Neb. 192, 21 N.W.3d 615 (2025).

#### (a) First Degree Sexual Assault of Child Conviction

Regarding Gaspar-Antonio's conviction of first degree sexual assault of a child, as charged, the State was required to prove that on or about January 17, 2020, through October 24, 2022, in Douglas County, Nebraska, Gaspar-Antonio, who was 25 years of age or older, subjected S.R.-L., who was at least 12 years of age but less than 16 years of age, to sexual penetration. See Neb. Rev. Stat. § 28-319.01(1)(b) (Reissue 2016). Gaspar-Antonio does not dispute the venue of the offense, nor does he challenge that, having been born in May 1981, he was over the age of 25 during the charged time period.

As it relates to the conviction for first degree sexual assault on a child, S.R.-L. testified that on one occasion when she was between 12 and 15 years old, Gaspar-Antonio put his fingers inside her vagina. This testimony meets the statutory definition of "sexual penetration," which includes "any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical, nonhealth, or nonlaw enforcement purposes." See Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2024).

This testimony was sufficient for a rational trier of fact to find that the essential elements of first degree sexual assault of a child were established. Nevertheless, Gaspar-Antonio argues there was no physical evidence corroborating S.R.-L.'s allegations and that the inconsistencies in S.R.-L.'s deposition and trial testimony undermined her credibility and the State's timeline, thereby negating the jury's findings that the crime was committed beyond a reasonable doubt. As it relates to corroboration, "[s]ince 1989, the State has not been required to corroborate a victim's testimony in cases of first degree sexual assault; if believed by the finder of fact, the victim's

testimony alone is sufficient." *State v. Anders*, 311 Neb. 958, 974, 977 N.W.2d 234, 249 (2022). Further, regarding potential inconsistencies in the victim's pretrial and trial statements, Gaspar-Antonio is essentially asking this court to make a credibility determination. But that is not the appellate court's function. An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Samayoa*, 292 Neb. 334, 873 N.W.2d 449 (2015). The jury was tasked with determining the credibility of the witnesses based upon the entirety of the witnesses' testimony and it is not the role of the appellate court to reweigh the jury's determination in that regard. Having reviewed S.R-L.'s testimony in the light most favorable to the State, S.R.-L. unequivocally testified to conduct by Gaspar-Antonio, which satisfied the elements of first degree sexual assault of a child. This assignment of error fails.

### (b) Third Degree Sexual Assault of Child Convictions

Gaspar-Antonio was convicted of three counts of third degree sexual assault of a child; one conviction related to victim S.R.-L. and two convictions related to victim D.G.-L.

Regarding the offense of third degree sexual assault of S.R.-L., as charged, the State was required to prove that on or about January 17, 2020, through January 16, 2022, in Douglas County, Nebraska, Gaspar-Antonio, who was at least 19 years of age or older, subjected S.R.-L., who was 14 years of age or younger, to sexual contact not causing serious personal injury. See Neb. Rev. Stat. § 28-320.01 (Reissue 2016). Similarly, regarding the two offenses of third degree sexual assault of D.G.-L, as charged, the State was required to prove that on or about May 1, 2019, through October 24, 2022, in Douglas County, Nebraska, Gaspar-Antonio, who was at least 19 years of age or older, subjected D.G.-L., who was 14 years of age or younger, to sexual contact not causing serious personal injury. "Sexual contact" is defined, in pertinent part, as

> the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. Sexual contact also means the touching by the victim of the actor's sexual or intimate parts or the clothing covering the immediate area of the actor's sexual or intimate parts when such touching is intentionally caused by the actor. Sexual contact includes only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party.

§ 28-318(5). "Serious personal injury" is statutorily defined as "great bodily injury or disfigurement, extreme mental anguish or mental trauma, pregnancy, disease, or loss or impairment of a sexual or reproductive organ." § 28-318(4).

We note that Gaspar-Antonio does not dispute venue, nor does he challenge that, having been born in May 1981, he was 19 years of age or older at the time of the charged offense. S.R.-L. testified that Gaspar-Antonio began touching her when she was approximately 13 years old and that he touched her vagina with his hands both over and under her clothing. D.G.-L testified that the touching began when she was 9 years old and that, on more than one occasion, Gasper-Antonio touched her vagina both over and under her clothing. Both victims testified that the touching ended when Gaspar-Antonio left for Washington in early 2022, when S.R.-L. was 14 or 15 years old, and D.G.-L. was 12 or 13 years old. Again, this testimony was sufficient for a rational trier of fact to

find the essential elements of third degree sexual assault of a child. Nevertheless, Gaspar-Antonio again argues there was no physical evidence corroborating the allegations and points to inconsistencies in the victims' testimonies. But, as we pointed out before, the State is not required to corroborate a victim's testimony. See Neb. Rev. Stat. § 29-2028 (Reissue 2016) (testimony of person who is victim of sexual assault as defined in §§ 28-319 to 28-320.01 shall not require corroboration), and it is not the role of this court to second guess credibility determinations of the fact finder. Having reviewed the victims' testimonies in the light most favorable to the State, the evidence satisfied the elements of each of the three charged counts of third degree sexual assault of a child. This assignment of error fails.

### 2. EXCESSIVE SENTENCES

Gaspar-Antonio assigns that the sentences imposed are excessive. Specifically, he argues that the district court failed to adequately and meaningfully consider the sentencing factors and, had the court done so, his sentences would have been substantially shorter.

Gaspar-Antonio was convicted of first degree sexual assault on a child, a Class IB felony, and three counts of third degree sexual assault on a child, Class IIIA felonies. See, § 28-319.01(2) (first degree sexual assault of a child); § 28-320.01(3) (third degree sexual assault of a child). Gaspar-Antonio's sentence of 25 to 35 years' imprisonment for first degree sexual assault on a child is within the statutory sentencing range for Class IB felonies which are punishable by a minimum sentence of 20 years' imprisonment and a maximum sentence of life imprisonment. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2024) (felonies; classification of penalties). Additionally, the sentence complies with the dictates of § 28-319.01(2) which requires a mandatory minimum sentence of 15 years' imprisonment for first degree sexual assault of a child. Further, Gaspar-Antonio's sentences of 2 to 3 years' imprisonment for each conviction of third degree sexual assault on a child are within the statutory sentencing range for Class IIIA felonies which are punishable by no minimum sentence and a maximum sentence of 3 years' imprisonment. See § 28-105.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors, as well as any applicable legal principles in determining the sentence to be imposed. *State v. Sutton*, 319 Neb. 581, 24 N.W.3d 43 (2025). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

There is nothing in the record to suggest that the district court did not consider all the relevant sentencing factors. The district court specifically stated that "[i]n fashioning this sentence, I've considered [Gaspar-Antonio's] age, mentality, education, and experience, social and cultural background, past criminal record, record of law-abiding conduct, the motivation for the offense, the nature of the offense, and the violence involved in the commission of this offense." And a

sentencing court is not required to articulate on the record that it has considered each sentencing factor nor to make specific findings as to the facts pertaining to the factors or the weight given them. *State v. Greer*, 309 Neb. 667, 962 N.W.2d 217 (2021).

At the time of sentencing, Gaspar-Antonio was 43 years old, had a fifth grade education, had three dependents, and did not have a prior criminal history. The Level of Service/Case Management Inventory assessed Gaspar-Antonio at a medium high risk to reoffend. The PSR noted that Gaspar-Antonio denied or minimized his culpability for the offenses, including verbally stating that "he was not guilty of what he [had] been convicted of." Both victims completed victim impact statements which noted that, as a result of Gaspar-Antonio's offenses, they had been placed in foster care and were receiving either psychiatric or psychological counseling.

Based on factors, including that Gaspar-Antonio's sentences were within the applicable statutory sentencing ranges, his risk to reoffend, the seriousness and the nature of the offenses, his failure to accept responsibility for the offenses, and the psychological harm caused to the victims, the sentences imposed were not an abuse of discretion. This assignment of error fails.

### 3. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Gaspar-Antonio assigns that his trial counsel was ineffective for failing to: (a) file any pretrial motions or object to prevent the admission of testimony related to the victim and the victim's siblings being placed in foster care, (b) file any pretrial motions or object regarding Detective Jimenez' testimony that the children were not safe to remain in their home, (c) file any pretrial motions or object regarding Maria's reaction to the victims' disclosure, (d) file any pretrial motions or object to the text messages between Sabrina Young and S.R.-L., (e) object to the introduction evidence relating to the victims' states of mind, (f) object to the State's leading redirect of both alleged victims and request to re-cross-examine to impeach new evidence admitted during redirect, (g) challenge two jurors for cause, (h) introduce alibi evidence in the form of testimony from his sister-in-law and work records, and (i) that the cumulative effect of counsel's errors and failures amounted to a deprivation of a fair trial by an impartial jury.

In *State v. Vazquez*, 319 Neb. 192, 21 N.W.3d 615 (2025), the Nebraska Supreme Court summarized the standard for ineffective assistance of counsel claims:

> Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.

> When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. To raise an ineffective assistance of counsel claim on direct appeal, the defendant must allege deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was

brought before the appellate court. When a claim of ineffective assistance of counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel.

Once raised, an appellate court will determine whether the record on appeal is sufficient to review the merits of ineffective performance claims. The record on direct appeal is sufficient to conclusively determine a claim of ineffective assistance of counsel if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. Conversely, an ineffective assistance of counsel claim will not be addressed on direct appeal if it requires examination of facts not contained in the record.

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington* [466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court may examine performance and prejudice in any order and need not examine both prongs if a defendant fails to demonstrate either. When reviewing claims of alleged ineffective assistance of counsel, trial counsel is afforded due deference to formulate trial strategy and tactics. There is a strong presumption that counsel acted reasonably, and an appellate court will not second-guess reasonable strategic decisions. And finally, in determining whether there is a reasonable probability that any deficient performance of trial counsel would have resulted in a different outcome in the proceeding, an appellate court may properly consider the strength of the admissible evidence relating to the controverted issues in the case.

### (a) Failure to File Pretrial Motion or Object to Rockwell's Testimony Regarding Foster Care Placement

Gaspar-Antonio assigns that his counsel was ineffective in failing to file a pretrial motion or object to Breanna Rockwell's testimony that the victims were placed in foster care after DHHS determined that they were not safe in their parents' custody. Gaspar-Antonio contends that this testimony

conveyed to the jury that a government agency had essentially concluded [that Gaspar-Antonio] was a danger to the children – a conclusion that invaded the jury's province and carried substantial weight due to Rockwell's role as a state investigator. Such testimony was inadmissible hearsay and improper opinion evidence.

Brief for appellant at 35. He further argued that "[e]ven if a portion of Rockwell's testimony could be deemed marginally relevant, its probative value was substantially outweighed by the risk of unfair prejudice" because "Rockwell's testimony painted a sympathetic and emotionally charged picture of helpless children being rescued from an unsafe home -- a narrative that risked misleading the jury into convicting based on emotion, not evidence." *Id*.

Here, Rockwell's testimony was cumulative to the victims' testimony and Young's testimony that, following the victims' disclosures, they were removed from their parents and placed in foster care. The submission of cumulative evidence regarding the children's placement in foster care negates any potential prejudice in Rockwell's testimony on the same subject. See, *State v. Prado*, 30 Neb. App. 223, 967 N.W.2d 696 (2021) (defendant could not show prejudice from cumulative hearsay testimony); *State v. Sawyer*, 319 Neb. 435, 22 N.W.3d 650 (2025) (finding that defendant could not establish prejudice because statement was cumulative to other admitted evidence). And insofar as Rockwell's testimony adds an additional component to the reason for removal, that component is inherent in the fact that the children were removed following their disclosures, but it remained the State's burden at trial to prove that the victims' disclosures were accurate. In short, because Rockwell's testimony on the same subject was cumulative of other properly admitted testimony on the same subject, we find no prejudice as to Gaspar-Antonio's claim that his counsel failed to object to Rockwell's testimony. This claim fails and is not preserved.

(b) Failure to File Pretrial Motion or Object to Detective Jiminez'
About Victims' Testimony About Victims' Removal

Gaspar-Antonio assigns that his counsel was ineffective in failing to file a pretrial motion or object to Detective Jimenez' testimony that the victims and their siblings were removed from the parental home due to safety concerns and that "there [were] two victims already. We didn't want to have any more victims." Gaspar-Antonio generally asserts the same arguments to Detective Jiminez' testimony that he proffered above in relation to Rockwell's testimony.

Similar to the previous assignment of error, Detective Jiminez' testimony was cumulative to other properly admitted testimony governing the children's placement in foster care following their disclosures of sexual abuse and therefore, Gaspar-Antonio cannot show he was prejudiced by counsel's alleged failure. Accordingly, this claim fails and is not preserved.

(c) Failure to File Pretrial Motion or Object to
Evidence of Maria's Reaction to Disclosures

Gaspar-Antonio assigns that his counsel was ineffective in failing to file a pretrial motion or object to Maria's reactions to hearing the victims' disclosures. Gaspar-Antonio argues that his trial counsel should have objected to the testimony that Maria did not believe the victims' reports of sexual abuse, the testimony that Maria stated that she would choose Gaspar-Antonio over the victims, and the State's overall depiction of Maria as "a callous and uncaring mother." Brief for appellant at 39. We read Gaspar-Antonio's assignment and argument here to be grounded on relevancy and unfair prejudice.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

without the evidence." Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 2016). The bar for establishing relevance is not a high one. *State v. Brown*, 302 Neb. 53, 921 N.W.2d 804 (2019). Relevancy requires only that the probative value be "'something more than nothing.'" *Id*. We will not reverse a trial court's determination regarding the relevancy of evidence unless it constitutes an abuse of discretion. *Id*.

Under rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *State v. Brown, supra*. Unfair prejudice means an undue tendency to suggest a decision based on an improper basis. *Id.* It speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis. *Id.*

Here, testimony regarding Maria's reaction to the victims' disclosures was relevant because the children first attempted to report Gaspar-Antonio's abuse to her and she refused to take any action. As a result, the victims reported the abuse to school staff, which resulted in an investigation and the eventual charges against Gaspar-Antonio. Under these circumstances, the evidence was relevant in relation to why the investigation was triggered by school staff rather than the victims' mother.

Ultimately, this testimony related to the credibility of the victims in relation to the manner and timing in which the assaults were reported. Accordingly, the evidence is both relevant and not unfairly prejudicial and counsel is not ineffective for failing to make a meritless objection. *State v. Anderson*, 305 Neb. 978, 943 N.W.2d 690 (2020). Accordingly, we reject this claim and find that it is not preserved.

### (d) Failure to File Pretrial Motion or Object to Text Messages Between S.R.-L and Young

Gaspar-Antonio assigns that his counsel was ineffective in failing to file a pretrial motion or object to the introduction of the text messages between S.R.-L. and Young. He contends that the text messages contained hearsay as to the identity of the perpetrator and the victims' concerns, and that Young's response about the victim being brave amounted to improper bolstering of S.R-L's claims.

Based on our review of the record, during trial, Gaspar-Antonio's counsel specifically stated he had no objection to the admission of the text messages. Gaspar-Antonio does not dispute that S.R.-L.'s contact and disclosures to Young were admissible to show the effect on the listener. However, Gaspar-Antonio contends:

> What is not admissible is that S.R.-L. reported that her [stepdad] was her abuser, and that she stated "his [sic] not here in Omaha but I don't want him to come back and keep doing it to me and I can't really explain over text I don't know what to do. And I don't want [Maria] to know anything about this." . . . There is no exception to the hearsay rule to allow the introduction of the text identifying her assailant and discussing S.R.-L.'s concerns. Additionally, there is no exception to the hearsay rule to allow the introduction of Young's reaction which was to tell S.R.-L. she was brave, that she was proud of her, and to thank S.R.-L. for trusting her. This bolstering of S.R.-L. conveys to the jury that others think she is "brave" for coming forward and that coming forward is something to be "proud of,"

which in essence endorses S.R.-L.'s claims. The text message content is collateral, irrelevant and prejudicial.

Brief for appellant at 40-41.

Although Gaspar-Antonio argues that the text messages between S.R.-L. and Young were inadmissible hearsay insofar as it related to the identification of him as the assailant and the victim's concerns about Gaspar-Antonio returning home, this evidence was cumulative of other evidence admitted and Gaspar-Antonio did not assign error to counsel's failure to object to the other properly admitted testimony. Gaspar-Antonio does not assign error related to Young's direct testimony identifying him as the perpetrator, nor does he challenge S.R.-L.'s testimony identifying him as the perpetrator or her concerns regarding him returning from Washington and the continuation of the touching. Rockwell, the initial assessment worker; the forensic interviewer; Ellwanger, the nurse practitioner; and Detective Jimenez all testified that S.R.-L. identified her stepfather as the perpetrator; and Gaspar-Antonio does not assign error to counsel's failure to object to that testimony. Because this evidence was cumulative to other admitted evidence, Gaspar-Antonio cannot show he was prejudiced based on counsel's failure to object to the text messages. See *State v. Sawyer*, 319 Neb. 435, 22 N.W.3d 650 (2025) (finding that, because statement was cumulative to other evidence, defendant cannot demonstrate prejudice based on counsel's failure to object). This assignment fails and is not preserved.

(e) Failure to Object to Testimony
Regarding Victims' States of Mind

Gaspar-Antonio next assigns that he received ineffective assistance of counsel when his counsel failed to object to the introduction of evidence regarding the victims' states of mind. Specifically, Gaspar-Antonio argues that his counsel should have objected to the victims' testimony about how they felt about the abuse, how they felt about having to report the abuse, or how they felt about the lack of support they received from Maria.

Gaspar-Antonio identifies that the improper testimony proffered by D.G.-L. was that she was "sad" when speaking to the school counselor, that she was "scared" after the counselor informed her that she had to report D.G.-L.'s disclosure, that she "didn't feel anything" when she had the physical examination, and that she decided to disclose the abuse when she "saw a chance to do it" and that she was afraid that "I would come back home and my mom would, like, do something to me." Brief for appellant at 42-43.

Gaspar-Antonio argues that evidence regarding the victims' states of mind is not relevant to the proceedings as it is not probative of Gaspar-Antonio's state of mind which is the critical issue in the case. In support of this contention, Gaspar-Antonio cites to *State v. Penley*, 288 A.3d 1183 (Me. 2023), as persuasive authority wherein the Supreme Judicial Court of Maine held that "a murder victim's state of mind is generally not probative of the defendant's state of mind and should not be admitted unless it is relevant to rebut a defense or justification that brings the [victim's] state of mind into question." But the State argues that the evidence was not offered to prove state of mind of the defendant but was instead offered to show the credibility of the victims as it related to the authenticity of their disclosures. In support of this contention, the State cites persuasive authority from *State v. Ortiz*, 609 A.2d 921 (R.I. 1992) holding that the evidence that

- 14 -

the victim was "very scared" assisted the jury to assess [the victim's] credibility, specifically her ability to recount the events in question. See also *Sweet v. State*, 234 P.3d 1193, 1207 (Wyo. 2010) (holding that testimony of what victim felt was relevant to show that "she exhibited a demeanor consistent with having experienced a traumatic event").

We agree with the State. After reviewing the nature of the contested disclosures involving the victims' states of mind while relating the disclosures of prior abuse, we cannot say that the evidence was irrelevant, as it went to the credibility of the victims who were making the disclosures. Under these circumstances, counsel was not ineffective for failing to raise a relevancy objection. This assignment fails and is not preserved.

### (f) Failure to Object to Leading Redirect
### of Victims and Failure to Recross

Gaspar-Antonio next assigns that his counsel was ineffective in failing to object to the State's leading redirect examination of both victims and failing to request to recross in order to impeach the victims on new evidence introduced during the State's redirect examination. Gaspar-Antonio contends that the State, through leading questions on redirect that were outside the scope of cross-examination, improperly introduced prior consistent statements from both victims. More specifically, Gaspar-Antonio argues:

> Trial counsel's failure to object meant that the State was allowed to introduce new evidence regarding S.R.-L.'s claims to Project Harmony (1) that she alleged [Gaspar-Antonio] would offer her money to sexually assault her, (2) that [Gaspar-Antonio] . . . would tell S.R.-L. not to tell [Maria] because [he would] go to jail, and then the family would not have anyone to help pay for their house. This new evidence was left uncontested because trial counsel failed to request a re-cross of S.R.-L. to challenge this new testimony. Furthermore, both alleged victims were basically fed their answers by the county attorney in re-direct. The leading colloquy on re[-]direct of both victims acted to improperly bolster the alleged victim's allegations and introduced new inflammatory evidence regarding payment of the victim and of the claim that [Gaspar-Antonio] was afraid of going to jail and used that to silence S.R.-L.

Brief for appellant at 47.

As it relates to counsel's alleged failure to object or to recross-examine the victims regarding evidence raised by the State on redirect examination, we disagree that any such evidence was newly raised. Specifically, regarding the topic of Gaspar-Antonio offering S.R.-L. money in exchange for touching her, Gaspar-Antonio's counsel specifically asked S.R.-L. during cross-examination about Gaspar-Antonio offering her money to touch her. Further, as it related to S.R.-L.'s testimony about Gaspar-Antonio telling her not to tell Maria because Gaspar-Antonio would go to jail and leave them without money, S.R.-L. testified to the same during direct examination by the State. While the questions were asked in a leading manner, the State's questions were asked after Gaspar-Antonio's counsel attempted to impeach S.R.-L. on her inconsistent statements and show that she was biased against Gaspar-Antonio as a means to indicate that S.R.-L. had fabricated the allegations against him. Any objection that the State's redirect was leading would not have resulted in a different trial result because the evidence was

cumulative of that which had already been introduced during direct examination. See *State v. Becerra*, 253 Neb. 653, 573 N.W.2d 397 (1998) (holding assigned error regarding trial counsel's ineffectiveness for failing to object to leading questions was meritless when evidence admitted through leading questions was cumulative of other properly admitted evidence). Therefore, this assignment of error fails and is not preserved.

### (g) Failure to Challenge Prospective Jurors For Cause Due to Impartiality

Gaspar-Antonio next assigns that his counsel was ineffective in failing to challenge two prospective jurors for cause on the basis that they "had identified themselves as persons who, before hearing any evidence, were already leaning or favoring one party, meaning that they had both formed an opinion regarding [Gaspar-Antonio's] innocence or guilt." Brief for appellant at 50.

A venireperson may be challenged for cause for having formed or expressed an opinion as to the guilt or innocence of the defendant. Neb. Rev. Stat. § 29-2006 (Reissue 2016). A juror who indicates an inability to fairly and impartially determine guilt by refusing to subordinate the juror's own personal views must be excused for cause. *State v. McHenry,* 247 Neb. 167, 525 N.W.2d 620 (1995).

Here, although Gaspar-Antonio complains that his trial counsel was ineffective in failing to challenge two potential venirepersons for cause, the record reflects that neither of these prospective jurors was actually seated on the jury. A similar situation was considered by the Nebraska Supreme Court in *State v. Rodriguez,* 272 Neb. 930, 939, 726 N.W.2d 157, 168 (2007), wherein the Nebraska Supreme Court stated:

> We have previously addressed whether a court's failure to strike prospective jurors who were not selected for the jury prejudices the defendant. In *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001), the defendant argued that he was denied a fair trial because the court failed to strike a prospective juror whom he challenged for cause. The defendant instead had to use one of his peremptory challenges to remove the juror. In deciding that the defendant was not prejudiced, we stated: "The true object of challenges, either peremptory or for cause, is to enable the parties to avoid disqualified persons and secure an impartial jury. When that end is accomplished, there can be no just ground for complaint against the rulings of the court as to the competency of jurors. . . . Even where a party's peremptory challenges are exhausted, the erroneous overruling of a challenge for cause will not warrant reversal *unless it is shown on appeal that an objectionable juror was forced upon the challenging party and sat upon the jury after the party exhausted his or her peremptory challenges*."

(Emphasis in original.)

Although neither of the two venirepersons about whom Gaspar-Antonio complains were seated on the jury, he argues that "[b]y keeping the prospective jurors in the [jury] pool, [his] trial counsel could not strike all jurors who could potentially be unfair, including [a prospective juror] who stated that her daughter was the victim of sexual assault at the hands of an acquaintance." Brief for appellant at 51.

The record here does not demonstrate that a juror with actual bias sat in judgment. Because Gaspar-Antonio cannot show a reasonable probability that, but for his counsel's alleged deficient performance, the result of the proceeding would have been different, his assignment of error fails and is not preserved. See *State v. Huff*, 25 Neb. App. 219, 904 N.W.2d 281 (2017) (defendant could not show prejudice when no juror with actual bias sat on jury and rendered verdict).

### (h) Failure to Adduce Testimony from Sister-In-Law or Introduce Work Records to Establish Alibi

Gaspar-Antonio assigns that he received ineffective assistance of counsel when his trial counsel failed to call his sister-in-law as an alibi witness to testify that she was at his residence every day and could vouch for his work habits, and when counsel failed to obtain his work records to show that he was not home at the times that the victims alleged that the assaults took place.

The record here does not disclose why counsel chose not to call his sister-in-law to testify or introduce Gaspar-Antonio's work records during the trial to establish his alibi. Therefore, we lack the record to determine this issue on direct appeal. See *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020) (finding that record contained nothing to explain why counsel chose not to introduce driving records to show defendant was on road at alleged times and therefore lacked record to determine the issue on direct appeal). This assignment of error is preserved for postconviction review.

### (i) Cumulative Error

Gaspar-Antonio assigns that the cumulative effect on trial counsel's errors amounted to a deprivation of a fair trial by an impartial jury. Although one or more trial errors might not, standing alone, constitute prejudicial error, their cumulative effect may be to deprive the defendant of his or her constitutional right to a public trial by an impartial jury. *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023).

We have determined that all but one of Gaspar-Antonio's claims of ineffective assistance are without merit. One unresolved claim cannot form the basis for a claim of cumulative error. Accordingly, Gaspar-Antonio's cumulative error argument fails. See *id*. (unresolved claims cannot form basis for claim of cumulative error).

## VI. CONCLUSION

Having considered and rejected the majority of Gaspar-Antonio's claims, we affirm his convictions and sentences, with the exception that we preserve for postconviction review his claim that his trial counsel was ineffective in failing to adduce testimony from his sister-in-law or introduce his work records to establish his alibi.

AFFIRMED.